**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| United States of America,<br>Plaintiff,<br>v.<br>Kaylem Skacy,<br>Defendant. | No. CR-25-08175-001-PCT-DWL<br>**ORDER** |

This case is set for trial on November 9, 2026. In advance of trial, the parties have filed an array of motions. This order addresses Defendant's motion to exclude the opinions of ATF Firearms Enforcement Officer Cody Toy ("Officer Toy"). (Doc. 37.) For the reasons that follow, the motion is denied without prejudice.

**RELEVANT BACKGROUND**

On September 11, 2024, a Navajo Nation police officer responded to a reported fight at the McDonald's in Tuba City, Arizona, within the boundaries of the Navajo Nation Indian Reservation. (Doc. 43 at 2.) When the officer arrived, a bystander told him that the white SUV parked near the front entrance was involved in the fight. (*Id.*) The officer pulled up behind the parked SUV and activated his lights and sirens. (*Id.*) Defendant was in the SUV's driver's seat. (*Id.*) The officer eventually conducted a search of the SUV and "found a black shoulder bag containing a Glock 19X pistol with a magazine inserted, a purple part on the back of the slide that appeared to be a 'switch,' and a small baggie containing a leafy green substance." (*Id.*) The United States contends that Defendant

admitted, after being detained and *Mirandized*, "that the gun was his and that it had something added on the back of the slide." (Doc. 47 at 2. *See also* Doc. 37 at 2.)[1]

On September 16, 2025, the grand jury returned a one-count indictment charging Defendant with Possession of a Machinegun, in violation of 28 U.S.C. §§ 922(o) and 924(a)(2). (Doc. 1.) The indictment reads: "On or around September 11, 2024, in the District of Arizona, the defendant, KAYLEM SKACY, did knowingly possess a machinegun, that is, a machinegun conversion device commonly known as a 'Glock switch,' which is designed and intended solely and exclusively for use in converting a firearm into a machinegun." (*Id.* at 1.)

On February 2, 2026, Officer Toy issued a "Report of Technical Examination." (Doc. 37-1 at 3-7.) The portion of the report entitled "Findings" states that Officer Toy began by inspecting "Exhibit 1," which is "a 9mm Luger caliber firearm, originally manufactured as a semiautomatic pistol by Glock, GmbH, in Austria," and that "[a]s received, Exhibit 1 [was] fitted with a machinegun conversion device further referenced as Exhibit 1A." (*Id.* at 4-5.) The report specifies that "Exhibit 1A is a combination of parts designed and intended for use in converting a semiautomatic, Glock-type pistol into a machinegun (similar to U.S. Patent 5,705,763) by utilizing an extended 'leg' to push the trigger bar down and out of engagement with the firing pin as the slide closes, releasing the partially retracted firing pin to travel forward and fire a cartridge. When the trigger is depressed, this device enables a Glock pistol to shoot automatically more than one shot, without manual reloading, with a single function of the trigger." (*Id.* at 5.) After examining Exhibits 1 and 1A, Officer Toy "performed a function test of Exhibit 1 with Exhibit 1A attached," during which "Exhibit 1 tested as a semiautomatic only." (*Id.*) During this test, Officer Toy "noted some damage to the leg of Exhibit 1A." (*Id.*) Next, Officer Toy "installed a small piece of paper as a shim under the leg of the device and performed the function test again," and during this second test, "Exhibit 1 tested positive for machinegun

[1] Defendant moved "to suppress the firearm seized from his vehicle, together with all derivative evidence obtained as a result of the unlawful search." (Doc. 43 at 1.) That motion was denied via separate order. (Doc. 79.)

functionality." (*Id.* at 5-6.) After Officer Toy "inserted a two-round ammunition load and pulled the trigger," "Exhibit 1 fired both rounds automatically by a single function of the trigger." (*Id.* at 6.) With that said, when Officer Toy then "inserted a five-round ammunition load and pulled the trigger, Exhibit 1 fired the first 3 rounds automatically by a single function of the trigger . . . [but] failed to fire the fourth round." (*Id.*) And when Officer Toy "repeated this test twice more," "Exhibit 1 only function[ed] as a semiautomatic firearm." (*Id.*)

Based on these findings, Officer Toy offers the following eight opinions in the portion of the report entitled "Conclusions":

1. "Exhibit 1 is a weapon which will expel a projectile by the action of an explosive and incorporates the receiver of such a weapon; therefore, Exhibit 1 is a 'firearm' as defined in 18 U.S.C. § 921(a)(3)(A)&(B)."

2. "Exhibit 1, with the Exhibit 1A conversion device installed, is a 'machinegun' as defined in 18 U.S.C. § 921(a)(24)."

3. "Exhibit 1, containing the Exhibit 1A machinegun-conversion device, being a machinegun, is also a 'firearm' as defined in 26 U.S.C. § 5845(a)(6)."

4. "Exhibit 1, containing the Exhibit 1A machinegun-conversion device, is a weapon which shoots, automatically more than one shot, without manual reloading, by a single function of the trigger; therefore, it is a 'machinegun' as defined in 26 U.S.C. § 5845(b)."

5. "Exhibit 1A, in and of itself, is a combination of parts designed and intended for use in converting a weapon into a machinegun; thus, it is a 'machinegun' as defined in 26 U.S.C. § 5845(b)."

6. "Exhibit 1A, being a machinegun, is also a 'firearm' as defined in 26 U.S.C. § 5845(a)(6)."

7. "Exhibit 1A is a 'machinegun' as defined in 18 U.S.C. § 921(a)(24)."

8. "Exhibit 1A bears no NFA manufacturer's marks of identification as required by 26 U.S.C. § 5842."

(*Id.*) Officer Toy also includes, as attachments to the report, various photographs of Exhibit

1A (*id.* at 8, 12, 14-15) and the patent paperwork related to U.S. Patent 5,705,763 (*id.* at 16-26).

On July 29, 2026, the United States filed a Rule 16(a)(1)(G) notice of intent to introduce Officer Toy's expert testimony. (Doc. 30.) The notice cross-references Officer Toy's report. (*Id.*) According to the notice:

> Officer Toy examined a Glock firearm, model 19X, 9mm Luger caliber, serial number CDSR259 (the "Glock"). He also examined a machine gun conversion device (commonly known as a "Glock switch") fitted to the Glock. The Glock's frame was modified to allow the Glock switch to function as designed and intended. Officer Toy will testify that the Glock switch is a combination of parts designed and intended solely and exclusively for use in converting a semiautomatic, Glock-type pistol into a machinegun (similar to U.S. Patent 5,705,763) by utilizing an extended "leg" to push the trigger bar down and out of engagement with the firing pin as the slide closes, releasing the partially retracted firing pin to travel forward and fire a cartridge. When the trigger is depressed, this device enables a Glock pistol to shoot automatically more than one shot, without manual reloading, with a single function of the trigger.

(Doc. 30 at 2.) The notice concludes:

> Based on his testing and observations, Officer Toy will testify that the Glock is a "firearm" as defined by federal law, pursuant to 18 U.S.C. § 921(a)(3)(A) and (B). Officer Toy will testify that the Glock, with the Glock switch installed, is a "machinegun" as defined by federal law, pursuant to 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b), and also a "firearm" as defined by federal law, pursuant to 26 U.S.C. 5845(a)(6). Officer Toy will also testify that the Glock switch, in and of itself, is a "machinegun" as defined by federal law, pursuant to 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b). It is also a "firearm" as defined by federal law, pursuant to 26 U.S.C. § 5845(a)(6).

(*Id.* at 3.)

The United States also provided (albeit belatedly) Officer Toy's resume. (Doc. 36-1.) It shows that Officer Toy has extensive firearms-related experience and training, including "[c]onducting examinations and testing of firearms, machinegun conversion devices, and related materials," attending multiple "firearms training courses," building firearms from scratch, "receiv[ing] training in firearm silencer manufacture, design and

operation," "receiv[ing] manufacturing and historical instruction" at multiple ammunition factories and firearm factories, receiving ATF training in multiple facets of weaponry, and testifying in more than a dozen federal trials. (*Id.*)

On September 23, 2026, Defendant filed the pending motion to exclude Officer Toy's opinions. (Doc. 37.)

On September 28, 2026, the United States filed a response. (Doc. 38.)

On October 5, 2026, Defendant filed a reply. (Doc. 42.)

On October 13, 2026, the grand jury returned a superseding one-count indictment. (Doc. 44.) It provides: "On or about September 11, 2024, in the District of Arizona, the defendant, KAYLEM SKACY, did knowingly possess a machinegun, that is, a machinegun conversion device commonly known as a 'Glock switch,' which is a combination of parts designed and intended for use in converting a weapon into a machinegun." (*Id.* at 1.)

On October 25, 2026, the United States produced the reports of two trial preparation interviews with Officer Toy. (Doc. 67-1.) During the second interview, on September 24, 2026, Officer Toy "explained that he conducted a manual function test of the firearm and machinegun conversion device (MCD) consistent with [ATF's] Standard Operating Procedures (SOPs). Upon completing the manual function test, [Officer] Toy determined the firearm and MCD would not work as received during a live test fire. As a result, [Officer] Toy adjusted the tolerances of the device using a small paper shim before he conducted a live test fire." (*Id.* at 2.)[2] The report states that this information is "consistent with what was contained in [Officer Toy's] written report related to the examination of Exhibits 1 and 1A in this case." (*Id.*)

On October 29, 2026, the Court issued a tentative ruling. (Doc. 80.)

On November 3, 2026, the Court heard oral argument. (Doc. 86.)

…

---

[2] The parties dispute whether these statements constitute exculpatory and/or impeachment evidence. (Docs. 67, 74.)

# ANALYSIS

## I. Legal Standard

"The party offering expert testimony has the burden of establishing its admissibility." *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

(*Id.*)

A district court's decision to admit or exclude expert testimony is guided by a two-part test that focuses on the opinion's relevance and reliability. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594-95 (1993). "The inquiry envisioned by Rule 702 is . . . a flexible one." *Id.* at 594. "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.

Evidence is relevant if it "has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* at 587 (quoting Fed. R. Evid. 401). "The Rule's basic standard of relevance thus is a liberal one." *Id.*

The basic standard of reliability is similarly broad. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Basically,

the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). *See also* Fed. R. Evid. 702, advisory committee note to 2000 amendments ("[P]roponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable . . . . The evidentiary requirement of reliability is lower than the merits standard of correctness.") (internal citation and quotation marks omitted).

Nevertheless, courts serve an important "gatekeeper" role when it comes to screening expert testimony. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. "Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.* This "general 'gatekeeping' obligation . . . applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Court has "broad discretion," both in deciding whether the evidence is reliable and in deciding how to test for reliability. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). In *Daubert*, the Supreme Court listed various factors that might be applicable, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. 509 U.S. at 593-94. However, "[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case." *Hankey*, 203 F.3d at 1168. In particular, "[t]he *Daubert* factors . . . simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Id.* at 1169.

*See also Kumho*, 526 U.S. at 150 ("[T]he relevant reliability concerns may focus upon personal knowledge or experience."); Fed. R. Evid. 702, advisory committee note to 2000 amendments ("Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.").

The bottom line is that "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *See* Fed. R. Evid. 702, advisory committee note to 2000 amendments. However, "nothing . . . requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The . . . standard does not require perfection." Fed. R. Evid. 702, advisory committee note to 2023 amendments.

II. <u>The Parties' Arguments</u>

Defendant moves to exclude Officer Toy's "opinion that the alleged machinegun conversion device ('MCD') is a machinegun under 26 U.S.C. § 5845(b)." (Doc. 37 at 1.) According to Defendant, "[t]he issue presented is a straightforward reliability issue. Toy never test-fired the Glock and alleged MCD in the condition in which they were seized and submitted to ATF. His initial function test did not demonstrate machinegun functionality. Rather than test-fire the firearm in that condition, Toy added a shim beneath the leg of the alleged MCD and repeated the function test. Only after adding that material did Toy go on to test-fire the firearm." (*Id.*) Defendant contends there is "no reliable methodology for adding materials to the alleged MCD, obtaining results from that altered configuration, and attributing those results to the device [Defendant] actually possessed. Nor do they explain the criteria by which Toy treated inconsistent testing as establishing machinegun functionality, much less how the device [Defendant] possessed was designed and intended

solely and exclusively to convert a weapon, here the Glock, into a machinegun." (*Id.* at 2.) Defendant concludes that "[o]n the presently disclosed record, [the United States] has not shown that Toy employed a reliable method for extrapolating from the performance of the shim-assisted firearm to the characteristics of the alleged MCD. . . . By stating the ultimate classification opinion without identifying the alteration on which the classification conclusion depends, the government's notice obscures the central methodological issue the Court must consider under Rule 702." (*Id.* at 9.)

In response, the United States argues that Defendant's "motion is based on a fundamental misunderstanding of the charge [Defendant] faces at trial. The defendant is charged with possessing a machinegun because he was caught with a machinegun conversion device commonly known as a Glock switch. The defendant's criminal liability is based on his possession of the Glock switch itself. It is not, as the defendant wrongly asserts in his motion, based on how his gun operated." (Doc. 38 at 1.) The United States continues: "The defendant's motion is therefore facially deficient: it never challenges the determination that his Glock switch in and of itself is a machinegun. The Court should deny the motion on this basis alone." (*Id.* at 2.) Alternatively, the United States argues that Defendant's challenge fails on the merits because Officer Toy's "opinion is based on his expertise and on an examination of the defendant's Glock switch. His written report provides a detailed explanation (with supporting pictures) about how the defendant's Glock switch is designed and intended to work. Officer Toy even includes a patent of a similar device designed to convert a 'semiautomatic firearm into an automatic firearm.' Officer Toy's opinion with respect to the defendant's Glock switch is reliable and satisfies Rule702 and *Daubert*. The defendant's attempt to superimpose science-based testing principles onto Officer Toy's non-scientific work is contrary to the law and makes no sense." (*Id.* at 6-7.)

In reply, Defendant argues that the United States "misunderstands the basis of [his] motion, though it is clear: [he] specifically challenges the reliability of Toy's opinion on whether the device, the alleged switch/machinegun conversion device ('MCD') itself—

i.e., not the gun with the switch installed—is designed and intended solely and exclusively to convert his Glock into a machinegun under 26 U.S.C. § 5845(b), because it was only with Toy's shim inserted that the device delivered—albeit only fleetingly—the continuous-fire function, which is essential to a device qualifying as a machinegun." (Doc. 42 at 1.) Defendant further contends that the United States "spends most of its efforts urging the Court to simply accept Toy's results without the scrutiny required by Rule 702, because he has qualifications and experience with firearms. But qualifications do not eliminate the need for a reliable connection between an expert's methods and his conclusion. . . . That is the problem here. Toy's experience may qualify him to conduct a firearms examination, but it does not establish that the method he used in this examination reliably supports his conclusion(s). Rule 702 requires the government to *show* that connection, not merely assert it." (*Id.* at 2-3.) Defendant adds: "Toy's 'combination of parts designed and intended' opinion is not independent of his shim-assisted testing; it expressly relies on his testing and observations . . . ." (*Id.* at 4.)

III. <u>Analysis</u>

It is helpful to begin by identifying what is not at issue. As noted, Officer Toy's report contains eight opinions. The first, third, and sixth opinions address whether the Glock (i.e., "Exhibit 1"), the alleged MCD (i.e., "Exhibit 2"), and/or the combination of those two devices qualifies as a "firearm." (Doc. 37-1 at 6 [first opinion: "Exhibit 1 is a weapon which will expel a projectile by the action of an explosive and incorporates the receiver of such a weapon; therefore, Exhibit 1 is a 'firearm' as defined in 18 U.S.C. § 921(a)(3)(A)&(B)."]; *id.* [third opinion: "Exhibit 1, containing the Exhibit 1A machinegun-conversion device, being a machinegun, is also a 'firearm' as defined in 26 U.S.C. § 5845(a)(6)."]; *id.* [sixth opinion: "Exhibit 1A, being a machinegun, is also a 'firearm' as defined in 26 U.S.C. § 5845(a)(6)."].) However, that issue will not be raised or disputed at trial—the superseding indictment only charges Defendant with possession of a "machinegun," not possession of a "firearm." (Doc. 44.)

The second and fourth opinions in Officer Toy's report address whether the

combination of the Glock and the alleged MCD qualifies as a "machinegun." (Doc. 37-1 at 6 [second opinion: "Exhibit 1, with the Exhibit 1A conversion device installed, is a 'machinegun' as defined in 18 U.S.C. § 921(a)(24)."]; *id.* [fourth opinion: "Exhibit 1, containing the Exhibit 1A machinegun-conversion device, is a weapon which shoots, automatically more than one shot, without manual reloading, by a single function of the trigger; therefore, it is a 'machinegun' as defined in 26 U.S.C. § 5845(b)."].) Although the United States' Rule 16(a)(1)(G) notice indicated an intention to elicit those opinions at trial (Doc. 30 at 3 ["Officer Toy will testify that the Glock, with the Glock switch installed, is a 'machinegun' as defined by federal law, pursuant to 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b)."]), the United States has since clarified that "[t]he question of whether the defendant's *gun* also operated as a machinegun is factually irrelevant with respect to the defendant's motion, as the defendant is not charged with that crime" and that "the question of whether the defendant's gun operated as a machinegun will not be before the jury." (Doc. 38 at 6, 8.) Given those clarifications, there is no need to address the admissibility of the second and fourth opinions, as the United States will not be eliciting them at trial. *See, e.g., Northern v. New Prime Inc.*, 2026 WL 2149462, *5 (S.D. Fla. 2026) ("Because Northern conceded that she will not offer the opinions of Kogan, New Prime's [Rule 702] Motion is denied as moot."); *United States v. Shaver*, 2023 WL 2837672, *1 (E.D. Ky. 2023) ("Turning first to the Government's motion on defense expert Cameron Lindsay's testimony, . . . Mr. Shaver's response renders some of these objections moot by agreeing to not elicit testimony on some of the subjects in Mr. Lindsay's expert disclosure.").

The eighth opinion in Officer Toy's report is that "Exhibit 1A bears no NFA manufacturer's marks of identification as required by 26 U.S.C. § 5842." (Doc. 37-1 at 6.) However, in its Rule 16(a)(1)(G) notice, the United States did not disclose an intention to elicit that opinion at trial. (Doc. 30.) As a result, the parties do not address that opinion in their motion papers. (Docs. 37, 38, 42.)

This leaves Officer Toy's fifth and seventh opinions, both of which relate to whether the alleged MCD alone qualifies as a "machinegun." (Doc. 37-1 at 6 [fifth opinion:

"Exhibit 1A, in and of itself, is a combination of parts designed and intended for use in converting a weapon into a machinegun; thus, it is a 'machinegun' as defined in 26 U.S.C. § 5845(b)."]; *id.* [seventh opinion: "Exhibit 1A is a 'machinegun' as defined in 18 U.S.C. § 921(a)(24)."].) The United States properly disclosed, in its Rule 16(a)(1)(G) notice, its intention to elicit those opinions at trial. (Doc. 30 at 3 ["Officer Toy will also testify that the Glock switch, in and of itself, is a 'machinegun' as defined by federal law, pursuant to 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b)."].) The Court's Rule 702 analysis will focus on those opinions.

As an initial matter, there is no merit to the United States' forfeiture argument, i.e., "[D]efendant's entire challenge is based on 'machinegun functionality'—i.e. the operation of the gun itself—and not the Glock switch" and thus "[D]efendant's motion is fatally deficient because it never challenges Officer Toy's determination that the defendant's Glock switch in and of itself is a machinegun under federal law." (Doc. 38 at 6.) Although Defendant's motion does focus, in extensive detail, on perceived flaws in how Officer Toy tested the functionality of the Glock, the motion specifically seeks the exclusion of Officer Toy's opinion that the alleged MCD alone qualifies as a machinegun: "[Defendant] moves to exclude the expert opinion and any derivative testimony of [Officer Toy] under Federal Rule of Evidence 702. [Defendant] asks for a hearing under Rule 702 before Toy may offer an opinion that the alleged machinegun conversion device ('MCD') is a machinegun under 26 U.S.C. § 5845(b)." (Doc. 37 at 1.) Thus, Defendant has not forfeited his challenge to Officer Toy's fifth and seventh opinions.

Turning to the merits, it is undisputed that Officer Toy possesses the necessary *qualifications* to offer those opinions (Doc. 42 at 2-3), and those opinions are obviously *relevant*, given that the sole charged offense turns on whether the alleged MCD does, in fact, qualify as a machinegun. The Rule 702 analysis thus hinges on the *reliability* of Officer Toy's fifth and seventh opinions.

The Court concludes that, at least on the present record, Officer Toy's fifth and seventh opinions are sufficiently reliable and that a pre-trial evidentiary hearing is

unnecessary to reach that determination. *See generally United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (explaining that "district courts are not required . . . to hold a '*Daubert* hearing'" but must still "make . . . findings regarding the reliability of [challenged] expert testimony"); *United States v. Alatorre*, 222 F.3d 1098, 0199 (9th Cir. 2000) ("The question in this case is whether the district court must hold a separate hearing before trial, as opposed to making an evidentiary determination during trial, in order to fulfill the 'gatekeeping' function outlined in the Supreme Court's trilogy of cases addressing the admissibility of expert testimony . . . . Although we believe that it may be appropriate, at least in some cases, to conduct a pretrial or other hearing outside the presence of the jury to assess preliminary questions of relevance and reliability relating to experts, we hold that a separate hearing is not required.").[3] Defendant's arguments to the contrary fail for two overarching reasons. First, Defendant effectively seeks to treat Officer Toy's fifth and seventh opinions as scientific opinions that should be scrutinized under the traditional *Daubert* factors, most notably whether the "methodology" Officer Toy followed when using a shim as part of the test-firing process is generally accepted within the ATF and/or in the broader field. (Doc. 37 at 2 ["The present disclosures establish no reliable methodology for adding materials to the alleged MCD, obtaining results from that altered configuration, and attributing those results to the device [Defendant] actually possessed."]; *id.* at 7 ["What reliable methodology permits Toy to attribute the performance of the shim-assisted changed firearm to the device [Defendant] actually had? Toy's report does not answer this question."]; *id.* at 8 ["No methodology supporting Toy's use of a shim exists."]; Doc. 42 at 2 ["The government's response leaves unanswered a basic Rule 702 question: what established methods did Toy apply when he departed from ATF's prescribed procedure and substituted a shim-assisted test of his own?"]; *id.* at 3 ["Toy's experience

---

[3] As in *Alatorre*, Defendant will "have an opportunity—during voir dire, at trial—to explore the relevance and reliability of the proposed testimony," and "if voir dire turn[s] up any issues, further questioning, outside the jury's presence, [will] be in order." *Id.* at 1105. A district court following this approach does "not abandon its gatekeeping function" and "fulfill[s] its duty to make a determination as to the reliability of the expert's testimony." *Id.*

may qualify him to conduct a firearms examination, but it does not establish that the method he used in this examination reliably supports his conclusion(s).”].) But “[t]he *Daubert* factors were not intended to be exhaustive nor to apply in every case” and are “simply are not applicable to [testimony] whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.” *Hankey*, 203 F.3d at 1168-69. Here, Officer Toy’s challenged opinions are textbook examples of knowledge- and experience-based opinions. *Cf. United States v. Mendoza-Paz*, 286 F.3d 1104, 1112-13 (9th Cir. 2002) (“Mendoza-Paz contends that the valuation expert’s testimony should have been excluded because it was not subject to empirical testing, could not be reviewed for error rates, and the estimates it contained had not been accepted in any expert community. . . . We have previously rejected [in *Hankey*] an argument similar to that made here. . . . The valuation expert testified that he had investigated illegal narcotics trafficking for eleven years and had participated in seminars on methods and techniques of drug trafficking organizations. He further testified that he obtained experience in the value of illegal narcotics from intelligence databases, in-house intelligence agents, confidential informants, defendants he had debriefed, and cooperating defendants. From this testimony, the district court could reasonably conclude that the expert was qualified to give testimony regarding the value of the seized marijuana. Therefore, the district court did not abuse its discretion in admitting the expert’s testimony.”); *United States v. Cormier*, 468 F.3d 63, 72 (1st Cir. 2006) (“We further found that the evidence relied upon by the ATF agent in that case—technical manuals, conversations with manufacturers, and the expert’s prior experience—was evidence reasonably relied upon by experts in the field.”).

To that end, Officer Toy’s report provides a detailed explanation of the steps he followed in formulating the challenged opinions—he (1) conducted an examination of the devices at issue, (2) compared the design of the alleged MCD to the design of a different MCD that has been patented (while providing the patent specifications of the comparison device), and (3) performed various tests (both before and after installing the shim). (Doc. 37-1 at 3-6, 12, 14-26.) This is the sort of detailed explanation that the Ninth Circuit has

approved when upholding the admission of knowledge- and experience-based expert testimony from a qualified law enforcement agent. *Compare United States v. Holguin*, 51 F.4th 841, 860 (9th Cir. 2022) ("Enriquez explained how he applied his experience, discerning the likely meaning of individual expressions in the context of Mexican Mafia operations, and producing a meaning that makes sense as a whole.") *and United States v. Decoud*, 456 F.3d 996, 1013-14 (9th Cir. 2006) (where "the expert explained the methodology that he used to interpret each of the handful of disputed words," "the district court faithfully . . . fulfill[ed] its gatekeeping function under *Daubert* and did not err in allowing the government's expert to testify as to the meaning of the new encoded words") *with United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002) (emphasizing that "[a]s a prerequisite to making the Rule 702 determination that an expert's methods are reliable, the court must assure that the methods are adequately explained" and concluding that the expert's explanation was inadequate because he "failed to explain in any detail the knowledge, investigatory facts and evidence he was drawing from"). *See also United States v. Barnes*, 2023 WL 3051661, *4 (N.D. Cal. 2023) ("[ATF Special Agent] Centofranchi's expert report adequately identifies the bases of his opinion: his physical examination of the gun and ammunition, ATF's list of firearms manufacturers and marking variances, ATF's ammunition manufacturers database and resource information, and other published resources . . . .").

Second, although the analysis could end there, Defendant's motion also fails because it rests on two faulty premises: (1) Officer Toy's approach was necessarily unreliable because he violated the ATF's standard operating procedures ("SOPs") when conducting his examination (Doc. 37 at 7 ["The SOP requires, in all instances, FEO's to test-fire all suspected machineguns as received, after the initial function test. Toy does not do that."]);[4] and (2) the challenged opinions are entirely dependent on the test-firing exercise Officer Toy performed after installing the shim. (Doc. 42 at 3 ["[Defendant]

[4] During oral argument, much of defense counsel's presentation focused on Officer Toy's alleged violation of the SOPs. To address that line of argument, this order expands upon the analysis in the tentative ruling issued before oral argument.

challenges Toy's methodology for classifying the device itself . . . because Toy never demonstrated that this device, as possessed by [Defendant], actually functioned to convert the Glock without first inserting an undocumented shim beneath a damaged leg."].)

As for the first premise, putting aside that it is reasonably debatable whether Officer Toy even violated the SOPs,[5] the existence of an SOP violation would not render his resulting opinions unreliable. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1047 (9th Cir. 2014) ("SQMNA argues that Pomona did not follow the Guidance Manual protocols . . . . *Daubert*, however, does not forbid admission of a report where the weight of the conclusions are subject to challenge. SQMNA's argument relates to adherence to protocol, which typically is an issue for the jury.") (cleaned up); *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions. This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony.") (cleaned up). Here, any SOP violation arising from the sequence of Officer Toy's test-firing exercise was a minor flaw that had no bearing on the reliability of the challenged opinions. As

---

[5] Although SOP § 6.1.1 states that "[i]n all instances, the FEO will attempt to test fire the evidence as received," SOP § 5.5 seems to contemplate that such test-firing will not always occur ("If the firearm will be test fired (Section 6), the FEO will attempt to test fire the evidence as received."), as do SOP § 6.0 ("If the FEO is unable to test the evidence due to evidence construction and/or safety issues, the FEO will contact the case agent before proceeding further."), and SOP § 6.1.3 ("If there is reason to doubt the safety of the firearm, the FEO, at his or her discretion, may chose not to fire the firearm."). (Doc. 37-1 at 40.) Additionally, under SOP §6.1.2, when (as here) "the evidence has a missing or broken part(s)," if "the FEO determines that the evidence can expel a projectile by action of an explosive through the installation of a commercially available part(s), the FEO will consult with the case agent before replacing the part(s) and document this in the report." (*Id.*) To that end, Officer Toy stated during a pair of pre-trial interviews that it was "within [the] Standard Operating Procedure" to use a shim "to show the MCD would function as its intended purpose" (Doc. 67-1 at 1) and that "he conducted a manual function test of the firearm and [MCD] consistent with [the] Standard Operating Procedures (SOPs)" (*id.* at 2).

discussed in more detail in the order denying Defendant's motions to dismiss the indictment, the *function* test that Officer Toy performed on the Glock and alleged MCD in their as-received condition, which is "at least a variant of the test that Defendant faults him for not performing," "produced the very result—a finding of only semi-automatic functionality—that Defendant views as exculpatory." (Doc. 78 at 12.) In other words, this isn't a situation in which Officer Toy incorrectly believed the Glock and alleged MCD had automatic functionality in their as-received condition—a false belief that an earlier test-firing exercise would have dispelled—and proceeded to form his challenged opinions on the basis of that false belief. To the contrary, Officer Toy understood, based on his initial function test, that the Glock and alleged MCD lacked automatic functionality in their as-received condition, yet he still concluded that "Exhibit 1A, in and of itself, is a combination of parts designed and intended for use in converting a weapon into a machinegun; thus, it is a 'machinegun' as defined in 26 U.S.C. § 5845(b)." (Doc. 37-1 at 6.)

As for the second premise, Officer Toy did not rely solely on the post-shim testing as the basis for his challenged opinions. As discussed in earlier portions of this order, Office Toy also based those opinions on his physical and visual examination of the alleged MCD and his comparison of its design to that of "similar" device described in U.S. Patent 5,705,763: "Exhibit 1A is a combination of parts designed and intended for use in converting a semiautomatic, Glock-type pistol into a machinegun (similar to U.S. Patent 5,705,763) by utilizing an extended 'leg' to push the trigger bar down and out of engagement with the firing pin as the slide closes, releasing the partially retracted firing pin to travel forward and fire a cartridge. When the trigger is depressed, this device enables a Glock pistol to shoot automatically more than one shot, without manual reloading, with a single function of the trigger. While examining the frame of Exhibit 1, I noted that it was modified at the rear to accept the leg of Exhibit 1A." (Doc. 37-1 at 5.)[6] This, too,

[6] During oral argument, defense counsel seemed to suggest that Officer Toy's comparative analysis regarding the device described in U.S. Patent 5,705,763 also violated the SOPs. This undeveloped argument lacks merit, as counsel did not identify any specific portion of the SOPs that Officer Toy violated. At any rate, SOP § 4.2 contemplates that a firearm examiner will "document, in the ATF Form 3311.2, . . . design features, physical characteristics, and any other information which directly affects the classification of the

underscores why any SOP violation related to Officer Toy's use of a shim does not undermine the reliability of his challenged opinions.

Accordingly,

**IT IS ORDERED** that Defendant's motion to exclude (Doc. 37) is **denied without prejudice**.

Dated this 5th day of November, 2026.



Dominic W. Lanza
United States District Judge

---

evidence," which "may include: . . . [m]achinegun features," "[r]eference material," and "[a]dditional documentation as necessary to classify the evidence." (Doc. 37-1 at 37.) Here, in the ATF Form 3311.2, Officer Toy described the alleged MCD's design features and physical characteristics, explained why it had machinegun features, and included reference material and additional documentation—specifically, the patent paperwork related to U.S. Patent 5,705,763. (*Id.* at 5-7, 16-26.)